UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————
                                            )
JOHN and GERALDINE PERRICELLI, )
                                            )
                    Plaintiffs,             )
                                            )        06 Civ. 2114 (CM) (LMS)
        -against-                           )
                                            )        REPORT AND
                                            )        RECOMMENDATION
CARMEL CENTRAL SCHOOL                       )
DISTRICT                                    )
                                            )
                    Defendant.              )
—————————————————————————

TO:     THE HONORABLE COLLEEN MCMAHON
        UNITED STATES DISTRICT JUDGE

        The parents ("Plaintiffs") of S.P., a child with a disability, commenced this action on

March 17, 2006, pursuant to the Individuals with Disabilities in Education Act ("IDEA"), 20

U.S.C. § 1415 (2000).[1]  Docket entry 1.  They seek to overturn the decision of the State Review

Officer ("SRO") denying their request for tuition reimbursement from Carmel Central School

District ("Defendant") for the placement of their daughter at the Darrington Academy

———————————————

        [1]The IDEA was recently amended by the Individuals with Disabilities Education
Improvement Act of 2004 ("IDEIA"), Pub. L. No. 108-446, 118 Stat. 2647 (Dec. 3, 2004), which
took effect on July 1, 2005.  Because all events related to this case, except for the decisions of
the Independent Hearing Officer ("IHO") and the SRO, occurred prior to the IDEIA's effective
date, all statutory citations refer to the IDEA, as codified prior to the enactment of the IDEIA.
See Lillbask v. Conn. Dep't of Educ., 397 F.3d 77, 80 n.1 (2d Cir. 2005); see also Decision of
State Review Officer ("SRO Decision") at 8 n.2.  Similarly, the applicable provisions of the
Code of Federal Regulations have recently been amended as well.  The amendments became
effective on October 13, 2006; however, the provisions in effect at the time that the relevant
events took place will be referenced herein.

("Darrington") in Blue Ridge, Georgia.  Complaint at ¶ 1-3.  Both sides moved for summary judgment.  Docket entries 9-10.  Your Honor referred this case to me for a Report and Recommendation on the parties' cross-motions for summary judgment on December 1, 2006. Docket entry 13.  After a review of the entire record and for the reasons stated below, I conclude, and respectfully recommend that Your Honor should conclude, that the SRO's decision should be upheld.  Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Defendant's cross-motion for summary judgment should be granted and Plaintiffs' motion for summary judgment should be denied.

I.      **BACKGROUND**

        A.      **Statutory Framework**

        The IDEA offers federal funds to states that develop plans to provide children with disabilities "a free appropriate public education," or a "FAPE."  20 U.S.C. § 1412(a)(1).  Under the IDEA, a FAPE must include "special education and related services" tailored to meet the unique needs of each child, Id. § 1401(8), and be "reasonably calculated to enable the child to receive educational benefits."  Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982).  Because the IDEA "expresses a strong preference for children with disabilities to be educated 'to the maximum extent appropriate,' together with their non-disabled peers," a FAPE must be provided to a child with disabilities in the "least restrictive setting consistent with the child's needs." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 199, 122 (2d Cir. 1998) (quoting 20 U.S.C. § 1412(5)).  "Only 'when the nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated."  Id.  If such an education cannot be achieved, "a school board may

2

be required to place a child in a residential institution if such a placement is necessary to provide an appropriate education."  Id.

The special education and related services required by the IDEA are delivered to a child with disabilities pursuant to an individualized education program ("IEP"), which is tailored to the individual needs of the child.  20 U.S.C. § 1414(d).  An IEP is a written program of instruction developed for the child at least annually, Id. § 1414(d)(4), by a "team" consisting of the local educational agency, the child's teacher, the child's parents or guardians, and, where appropriate, the child.  Id. § 1414(d)(1)(B).  In New York, the IEP Team is called the Committee on Special Education ("CSE").  N.Y. Educ. Law § 4402(1)(b)(1).  Under the IDEA, an IEP must state, *inter alia*:  (1) the child's present levels of educational performance; (2) a statement of measurable annual goals; and (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs.  Id. § 1414(d)(1)(A).

In addition to the IEP, the IDEA provides "procedural safeguards" to ensure the provision of a FAPE.  Id. § 1415(a).  Specifically, the IDEA requires states to provide parents with "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  Id. § 1415(b)(6).  "Whenever [such] a complaint has been received . . ., the parents involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency."  Id. § 1415(f)(1).  New York provides a two-tiered administrative review process in which complaints are first reviewed

3

through a hearing conducted by a local hearing officer.  <u>Antonaccio v. Bd. of Educ.</u>, 281 F. Supp. 2d 710, 712 (S.D.N.Y. 2003) (citing N.Y. Educ. Law. § 4404).  A local hearing officer's decision may be appealed to the state review officer.  <u>Id.</u>  Any party still aggrieved after the decision of the state review officer may bring an Article 78 proceeding in state court or a federal action under the IDEA.  <u>Id.</u>  (citing 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3)).

Thus, pursuant to these procedural safeguards, parents dissatisfied with a proposed IEP may unilaterally remove their child from a public school, place the child in a private school they believe to be appropriate to the child's needs, and file a complaint with the state educational agency challenging the appropriateness of the IEP and seeking reimbursement for the private school tuition from the school district.  <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d 186, 192 (2d Cir. 2005).  In order to establish entitlement to reimbursement, the parents of a disabled child must establish three factors, called the <u>Burlington</u> factors: (1) that the District's IEP was inappropriate to meet their child's special needs; (2) that the parents' placement was appropriate; and (3) that equitable factors weigh in the favor of reimbursement.[2]  <u>Gagliardo</u>, 418 F. Supp. 2d at

---

[2] Until recently, the School District bore the burden of proof under the first <u>Burlington</u> factor to show the appropriateness of the contested IEP.  However, on November 14, 2005, the Supreme Court held that the party requesting relief in IDEA cases, which almost invariably is the parent or parents of a disabled child, <u>see</u> <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 418 F. Supp. 2d 559, 563 (S.D.N.Y. 2006), should bear the burden of proof for all three <u>Burlington</u> factors. <u>Schaffer v. Weast</u>, 546 U.S. 49 (2005).  Because the IHO issued his decision on October 4, 2005, he appropriately, though incorrectly, placed the burden of proof as to the adequacy of the IEP on the School District.  Although the SRO did not discuss the burden of proof in his December 23, 2005, decision, the SRO cited to the <u>Schaffer</u> decision.  SRO Decision at page 8.  Thus, it can be presumed that the SRO was aware of the <u>Schaffer</u> decision and reviewed the evidence as if the burden of proof rested on Plaintiffs to show all three <u>Burlington</u> factors.  In any event, I have reviewed the record as if the burden of proof rested with Plaintiffs, and I conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs have not carried their burden.  <u>See</u> <u>Gagliardo</u>, 418 F. Supp. 2d at 572.

563 (citing <u>M.S. v. Bd. of Educ.</u>, 231 F.3d 96, 102, 104 (2d Cir. 2000); <u>Walczak</u>, 142 F.3d at

129.)  <u>See also</u> <u>Burlington Sch. Comm. v. Dep't of Educ.</u>, 471 U.S. 359 (1985).

    **B.**    <u>**Summary of Relevant Facts**</u>[3]

      S.P. was born to a crack-addicted mother and, after she was abandoned for two days as an

eight-month-old, she was placed in foster care.  Complaint at ¶ 6.  When she was three years old,

S.P. went to live with Plaintiffs, and was later adopted by them.  <u>Id.</u> at ¶¶ 6, 8.  Plaintiffs enrolled

S.P. in kindergarten in the Carmel Central School District for the 1994-95 school year, but S.P.

had a difficult time adjusting to the academic demands of kindergarten.  <u>Id.</u> at ¶6; Plaintiff's Aff.

in Support at ¶ 6.  S.P. was eventually diagnosed as Learning Disabled, and was medically

diagnosed with Oppositional Defiant Disorder, and Attention Deficit Hyperactivity Disorder,

Predominantly Hyperactive Impulsive Type.  Complaint at ¶¶ 7-8; Defendant's 56.1 Statement at

¶ 43; Plaintiff's Aff. in Support at ¶ 8.  S.P. was recommended for special education in first grade.

Complaint at ¶ 8; Defendant's 56.1 Statement at ¶ 14.  In fourth grade, S.P.'s classification was

changed to Other Health Impaired.  Complaint at ¶ 9; Defendant's 56.1 Statement at ¶ 47.  When

S.P. was in fifth grade, the CSE recommended that S.P. be placed at Glenhome Deveraux School

---

[3] The facts in this section are taken from: (1) the Complaint; (2) Plaintiffs' Memorandum
of Law in Support of their Motion for Summary Judgment ("Plaintiffs' Memorandum in
Support"); (3) Plaintiffs' Affidavit in Support of Motion for Summary Judgment ("Plaintiffs' Aff.
in Support"); (4) Plaintiffs' Attorney Affidavit in Support of Motion for Summary Judgment; (5)
Defendant's Memorandum of Law in Support of its Motion for Summary Judgment
("Defendant's Memorandum in Support") and its accompanying 56.1 Statement ("Defendant's
56.1 Statement"); (6) Affidavit of Kathryn W. Rohe in Support of District's Motion for Summary
Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment; (7) Plaintiffs'
Opposition to Defendant's 56.1 Statement; (8) the Administrative Record ("AR"), which includes
the transcripts of the impartial due process hearing ("TR") and exhibits offered by Defendant
("Defendant's Exhibit") and Plaintiffs ("Plaintiffs' Exhibit").  The facts in this section are
uncontested, unless otherwise noted.

("Deveraux"), a twelve month therapeutic residential program for students with emotional difficulties.  Complaint at ¶¶ 10-11; Defendant's 56.1 Statement at ¶ 73-74.  S.P. remained at Deveraux for the sixth, seventh, and eighth grades.  Id. at ¶ 11; Defendant's 56.1 Statement at ¶ 73-74.  At the end of eighth grade, S.P.'s classification was changed to Emotionally Disturbed.  Complaint at ¶ 12.

In June, 2003, S.P.'s mother requested that S.P. return to the Carmel Central School District for high school.  Plaintiff's Aff. in Support at ¶ 22; Defendant's 56.1 Statement at ¶ 82.  The CSE convened on September 10, 2003, to discuss S.P.'s return to the District, and recommended placement in an "out of district special education therapeutic program."  Defendant's Exhibit 17 at pages 1,  4.  S.P. subsequently attended Green Chimneys, a private, State-approved therapeutic day program.  Complaint at ¶ 13; Defendant's 56.1 Statement at ¶ 87.  After arranging an observation of S.P. at Green Chimneys (see Defendant's Exhibit 12), the CSE recommended that S.P. begin the second semester of ninth grade in a full-time special education program with a student/staff ratio of 12:1:1 (twelve students, one teacher, and one aide), also called the PACE program, at Carmel High School.  Complaint at ¶¶ 14-15; Defendant's 56.1 Statement at ¶ 91.  The PACE program included a daily special reading class, speech/language therapy twice a week, and counseling by the school social worker once a week.  Complaint at ¶ 14; AR, Defendant's Exhibit 11A; Defendant's 56.1 Statement at ¶ 89.  S.P. began attending the PACE program at Carmel High School in February, 2004.  Id. at ¶ 15.  On April 15, 2004, the CSE convened to develop S.P.'s IEP for the 2004-05 school year.  Defendant's 56.1 Statement at ¶ 96.  The CSE recommended the same schedule for the 2004-05 school year as it had for the 2003-04 school year.  Id. at ¶ 8; AR, Defendant's Exhibit 10.

According to Defendant, S.P. easily made the transition from the residential program at Deveraux to the PACE program.  Defendant's 56.1 Statement at ¶ 91.  However, S.P.'s academic

performance began to deteriorate in the spring of 2004, due to excessive socialization, failure to complete homework, and lack of class preparedness.  Defendant's 56.1 Statement at ¶¶ 93-95.  When the CSE met to propose an IEP for the 2004-05 school year, the CSE recommended the PACE program again.  Id. at ¶ 98; AR, Defendant's Exhibit 10.  According to S.P.'s teachers, S.P. completed the first quarter of the 2004-05 school year without any difficulties.  Defendant's 56.1 Statement at ¶ 100.  Again, however, S.P.'s performance began to deteriorate toward the end of the second quarter.  Id. at ¶ 102; AR, TR at pages 143-44.  S.P. had a number of discipline problems over the course of the next two quarters.  Defendant's 56.1 Statement at ¶¶ 120, 122, 132.  In response, teachers in the PACE program employed a variety of strategies including verbal cues, physical cues, removal from class, and referral to the school social worker, Dr. Brenner.  Defendant's 56.1 Statement at ¶ 102; AR, TR at pages 145-47.  S.P.'s teachers also implemented a "daily reporting system," one of the PACE program's behavior modification strategies.  Defendant's 56.1 Statement at ¶ 133; AR, TR at pages 145-47.  Under the daily reporting system, S.P. was required to carry a report from class to class and have each teacher sign the report, indicating whether she was present, tardy, and/or prepared; whether she engaged in class work; and whether the teacher had any other comments to report.  AR, Plaintiff's Exhibits 14-17.  S.P. was deprived of her free periods if S.P. was late to her classes.  AR, TR at pages 145-47.  S.P.'s teachers believed that S.P.'s behavior improved as a result of this strategy.  AR, TR at pages 147-49.

Because of trouble with S.P. at home, however, S.P.'s mother requested through a letter dated January 24, 2005, that Defendant change S.P.'s placement to a residential program, claiming that S.P. needed a therapeutic setting.  Complaint at ¶ 17; Plaintiff's Exhibit M; Defendant's 56.1 Statement at ¶ 113.  When the CSE convened to review the request on January 27, 2005, the CSE declined to change S.P's placement, believing that her current placement was appropriate.

Complaint at ¶ 18; Defendant's 56.1 Statement at ¶ 115.  At that time, because she felt that S.P.'s

family needed outside assistance, Dr. Brenner made arrangements for S.P. to be placed

temporarily at Arbor House, a respite center from which she would continue to attend the PACE

program.  Defendant's 56.1 Statement at ¶¶ 115-19; AR, TR at page 549.  S.P. spent three weeks

at the Arbor House, and then returned home.  Id.

Also in January, 2005, S.P. was allegedly involved in sexually inappropriate behavior

with another student in her class in the school library.  Complaint at ¶ 19; Defendant's 56.1

Statement at ¶¶ 104-08.   The school investigated the incident by asking several students whether

they had seen anything, and by asking S.P. and the other student if the incident had occurred.

AR, TR at pages 402-06.  When all students denied seeing the incident and S.P. and the other

student denied that it took place, the school decided not to report the event to S.P.'s parents.  Id.

However, in March, 2005, when S.P. admitted to her mother that the event took place

(Defendant's 56.1 Statement at ¶ 106), S.P.'s mother again requested that the CSE change S.P.'s

placement to a residential placement.  Complaint at ¶ 19; Defendant's 56.1 Statement at ¶ 125.

On April 4, 2005, when the CSE convened to review S.P.'s 2004-05 IEP and to develop an IEP

for the 2005-06 school year, it declined to grant the request.  Complaint at ¶ 20; Defendant's 56.1

Statement at ¶ 126.  Instead, the CSE recommended that S.P. continue in the PACE program,

concluding that the incident in the library was typical for children of S.P.'s age, and relying on the

behavior modification strategies, especially the daily reporting system, to address S.P.'s discipline

problems.  Defendant's 56.1 Statement at ¶ 108; AR, TR at pages 564-67.  However, in late May,

2005,  S.P. came to school and announced that she would be leaving the Carmel Central School

District in two days to attend Darrington.  Defendant's 56.1 Statement at ¶ 135.  Thereafter,

Plaintiffs sent S.P. to Darrington (Complaint at ¶ 23; Defendant's 56.1 Statement at ¶ 136),

submitted a complaint objecting to the CSE's placement of S.P. by letters dated May 11, 2005 and

June 2, 2005, and requested reimbursement at a preliminary conference on June 16, 2005.

Complaint at ¶ 22; Defendant's 56.1 Statement at ¶ 137; Decision of Independent Hearing Officer

("IHO Decision") at page 1.

      **C.**     **Procedural History**

            *1)*     *Independent Hearing*

The hearing, conducted by an independent hearing officer, commenced on July 12, 2005,

and continued on July 18-19, 2005, and August 17, 2005.  IHO Decision at page 1.  At the

hearing, Kathryn Rohe, Director of Pupil Services for the School District, Roger Hofmann, one of

S.P.'s special education teachers; S.P.'s mother; Richard Darrington, Director of Darrington

Academy; April Blenn, a Family Representative for Darrington Academy; S.P.; Wendy Gentile,

Assistant Principal at Carmel High School; Colleen Willisch, a Teaching Assistant at Carmel

High School; and William Twardy, S.P.'s Physical Education teacher at Carmel High School,

testified.  AR, TR pages 1-661.

After hearing the testimony and reviewing the documentary evidence submitted by the

parties, the IHO concluded in a twenty-page, double-spaced, decision that the 2005-06 IEP was

inadequate to provide S.P. with a FAPE, that Darrington was an appropriate placement for S.P.,

and that no equitable considerations prohibited reimbursement to Plaintiffs.  IHO Decision at

page 8-19.  Under the first Burlington factor, the IHO concluded that the IEP was both

procedurally and substantively inadequate.  Id. at pages 8-14.  The IHO stated that the IEP was

procedurally inadequate for two reasons.  First, the IHO found that the evaluations and testing

relied upon by the CSE in order to create the 2005-06 IEP were not appropriate and did not reflect

S.P.'s needs.  Id. at page 9.  Specifically, the IHO pointed out that the psycho-evaluation relied

upon by the CSE was conducted in 2002 while S.P. was at Deveraux, and that a more recent

psycho-evaluation simply relied on the findings of the 2002 psycho-evaluation and did not

include any new testing.  Id.  In addition, the IHO found that the student observation relied upon by the CSE was taken while S.P. was at Green Chimneys, a much more structured environment than the PACE program.  Id. at pages 9-10.  The IHO also found that the CSE's failure to conduct a Functional Behavioral Assessment ("FBA") was a violation of the IDEA, state law, and regulations.  Id. at page 10.  Finally, the IHO also concluded that a 1998 psychiatric report relied upon by the CSE was too old to be relevant to the CSE's recommendation, and that the Social History Report relied upon by the CSE was merely a parent questionnaire, containing little relevant information.  Id.

Second, the IHO found the 2005-06 IEP procedurally inadequate because the School District failed to provide S.P.'s parents with a meaningful opportunity to participate in its creation. Id. at page 11.  Specifically, the IHO pointed to the fact that S.P.'s mother wanted the CSE to consider the effect of the January, 2005, incident of sexually inappropriate behavior on S.P.'s behavior, and offered a letter about the incident from S.P.'s therapist to the CSE.  Id.  Citing the inability of Dr. Brenner to remember the issue being raised at the April 4, 2005, annual review, the IHO found that the School District dismissed the therapist's opinion of the event and did not take the concern of S.P.'s mother seriously.  Id. at pages 11-12.

The IHO also found the IEP substantively inadequate, pointing to numerous in-school suspensions and dismissals from class and finding that S.P.'s disciplinary issues interfered with her ability to benefit from the PACE program.  Id. at pages 12-14.  The IHO noted that he did not find the School District's contention that the daily reporting system was improving S.P.'s behavior to be persuasive because S.P. had two in-school suspensions while the strategy was in place.  Id. at pages 13-14.  In addition, the IHO stated that S.P.'s dramatically improved grades were not

substantiated by test scores or other assignments.  Id. at 14.

Under the second Burlington factor, the IHO concluded that S.P.'s placement at Darrington was appropriate.  Id. at page 15.  The IHO pointed to testimony from two Darrington representatives who explained that the school provides a highly structured program for children whose behavioral problems affect their academic performance, and stated that S.P. was doing well behaviorally and, to some extent, academically.  Id. at pages 15-19.  The IHO noted that although psychiatrists and psychologists were not part of the Darrington staff, they were available to students requiring them.  Id. at page 19.  Finally, the IHO referenced S.P.'s testimony that she was "reading now more than ever" and doing her assignments.  Id. at page 18.  Noting that Defendants had not questioned Plaintiffs' cooperation with the recommendation, the IHO declined to address any equitable considerations under the third Burlington factor.  Id. at page 19.  In accordance with his decision, the IHO ordered that Plaintiffs be reimbursed for Darrington tuition from May, 2005, through the 2005-06 school year.  Id. at 20.

### 2)   *Defendant's Appeal to SRO*

After the IHO issued his decision, Defendant submitted an appeal from the IHO's decision to the SRO.  Decision of State Review Officer ("SRO Decision") at page 7.  Defendant argued that the IHO erred in determining that the School District failed to offer a FAPE to S.P, and that Darrington was an appropriate placement for S.P.  Id.  Specifically, Defendant argued that (1) the IEP was procedurally appropriate because the evaluations and observations were reconsidered within the last three years and that an FBA was not required; (2) the IEP was substantively appropriate because S.P. had shown prior progress in the same program; and (3) Darrington was inappropriate because S.P. was not adequately grouped, because S.P. was given inadequate

11

instruction, and because S.P.'s social and emotional needs were not addressed.  Id.

In a detailed, seventeen-page, single-spaced opinion, the SRO granted Defendant's appeal, finding that the 2005-06 IEP provided S.P. with a FAPE, and that Plaintiffs' placement of S.P. at Darrington was inappropriate.  Id. at pages 10-17.  The SRO first addressed the IHO's concerns about the IEP's procedural appropriateness.  The SRO stated that, even though the October 6, 2004, psychological reevaluation relied on information and testing recorded on March 3, 2002,  it was sufficient because at the 2004 reevaluation, the psychologist determined that another cognitive assessment was not necessary.  Id. at pages 10-11.  The SRO noted that the psychologist was permitted to make this determination under N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(2).  Id. at page 11.

Next, the SRO noted that the 2005-06 IEP did not list the December 11, 2003, student observation or the 1998 psychiatric evaluation among the documents considered by the CSE, indicating that the CSE did not rely on these documents.  However, the SRO concluded that the CSE reviewed ample information about S.P.'s behavior and progress in the PACE program from her teachers, social worker, and speech-language therapist.  Id. at pages 10-12.  The SRO further noted that although the CSE did not have access to any recent standardized test results, the CSE did have access to S.P.'s January 28, 2005, report card.  Id. at 11.

Addressing the 1998 psychiatric report specifically, the SRO concluded that there was no need for a more recent report because a psychiatric progress report had been prepared in October, 2003, which was consistent with the observations of the PACE program staff.  Id.  Thus, the SRO concluded that "the record does not reveal that [S.P.] was exhibiting symptoms at school which warranted a psychiatric evaluation."  Id.  Also addressing the Social History Report specifically,

the SRO stated that while he agreed with the IHO that the report was inadequate, he found that its inadequacy did not affect the CSE's determination of S.P.'s needs because S.P.'s teachers and social worker were in frequent contact with S.P.'s mother, and thus were well aware of the concerns of S.P.'s mother.  Id.

The SRO also found that the IEP was substantively appropriate.  Id. at 12.  In support of this conclusion, the SRO pointed to testimony by School District officials that S.P. had made a successful transition to Carmel High School, had developed appropriate relationships with staff and classmates, and was an eager participant in the PACE program.  Id.  The SRO found that S.P.'s tardiness to class and frequent suspensions were not due to an inappropriate IEP; rather, they were due to excessive social interactions and behavior linked to difficulty at home.  Id.  In addition, the SRO concluded that the CSE was not required to conduct an FBA because S.P.'s behavior did not impede her learning or that of other students.  Id. at 13.  The SRO pointed to testimony by School District officials that S.P.'s behavior did not rise to the level requiring behavior intervention beyond what the PACE program already offered, and that S.P. was able to successfully employ strategies learned in the PACE program.  Id. at pages 13-14.

Although the SRO was not required to determine whether or not Plaintiffs' placement of S.P. at Darrington was appropriate given his conclusion that the 2005-06 IEP was appropriate, the SRO continued his analysis and concluded that Darrington was not an appropriate placement for S.P.  Id. at 14.  The SRO cited Darrington's larger class sizes; computer-based learning; lack of a staff therapist, psychiatrist, or counselor; and more limited teacher interaction as the basis for his conclusion.  Id. at 15-16.  The SRO also pointed out that S.P. was not grouped with students with similar needs at Darrington.  Id. at 16.  He noted that S.P. was the only student classified as

13

Emotionally Disabled and that many of the students had been placed at Darrington by courts or their parents because of criminal activity and vandalism.  Id.  The SRO did not address whether or not equitable considerations weighed in favor of granting Plaintiffs reimbursement.

### 3)    *Proceedings in this Court*

Plaintiffs brought this action, appealing the SRO's decision, on March 17, 2006.  Docket entry 1.  Plaintiffs argue that the SRO erred in concluding that they are not entitled to reimbursement because the 2005-06 IEP developed for S.P. was both procedurally and substantively inadequate.  Plaintiffs' Memorandum in Support at pages 9-19.  Plaintiffs' Memorandum in Support seems to assert five arguments to support the conclusion that the 2005-06 IEP is procedurally flawed: (1) the CSE improperly relied on a seven-year-old psychiatric report; (2) the CSE improperly relied on a classroom observation conducted in a one-on-one setting, as opposed to the 12:1:1 PACE program setting; (3) the CSE improperly relied on a three-year-old FBA from S.P.'s previous residential placement, and failed to adequately address S.P.'s behavioral issues; (4) the 2005-06 IEP failed to address a report by S.P.'s private therapist which stated that S.P. was easily distracted; and (5) the CSE ignored Plaintiffs' complaints about S.P.'s behavior at home and S.P.'s inappropriate sexual behavior.  Id.  Plaintiffs' first four arguments can be categorized as challenging the adequacy of the information on which the 2005-06 IEP was based.  As explained by the IHO, the last argument challenges Defendant's provision of a meaningful opportunity to participate in S.P.'s education to Plaintiffs.  See IHO's Decision at page 11.

Arguing that the 2005-06 IEP was substantively inadequate, Plaintiff assert that S.P.'s frequent removal from her special education class prohibited her from benefitting from her

education.  Plaintiff's Memorandum in Support at page 17.  Plaintiffs argue that S.P.'s grades are not an indication of progress because they were based on unknown criteria.  Id. at page 18.  Plaintiffs also argue that S.P.'s increasing behavioral problems over the second and third quarters of the 2004-05 school year indicate that the IEP was substantively inappropriate.  Id. at page 19.

Finally, Plaintiffs argue that Darrington is an appropriate placement for S.P.  Id. at page 20.  Plaintiffs point out that S.P. receives intensive, individualized instruction in all academic areas; has maintained a "C" average; has perfect attendance; and has participated in "character and communication skills-building" at Darrington.  Id.  Plaintiffs argue that S.P.'s success at Darrington indicates that Darrington offers the highly structured setting and behavioral program that S.P. requires.  Id. at page 21.

Defendant argues that the SRO's decision should be upheld.  Defendant's Memorandum in Support at page 1.  It argues that the IEP at issue was both procedurally and substantively adequate, and that Plaintiffs' unilateral placement of S.P. at Darrington was inappropriate.  Id. at pages 12-24.  Defendant argues that the IEP was procedurally adequate because it was based on a 2004 psychological reevaluation, not a 1998 psychological evaluation; because the CSE had sufficient observational information regarding S.P.'s then-current functioning in the 12:1:1 setting in the PACE program; because a psychiatric report was not deemed necessary; and because the CSE had adequate information about S.P.'s social history.  Id. at pages 14-17.

Defendant argues that the IEP was substantively appropriate because it was reasonably calculated to confer a meaningful educational benefit.  Id. at page 17.  This is evidenced, Defendant argues, by S.P.'s successful transition to Carmel High School, positive and appropriate relationships with staff and classmates, and eager participation in the PACE program.  Id. at page

18.  Defendant argues that S.P.'s frequent disciplinary issues were a result of S.P.'s relationship with her mother, and were handled appropriately by the daily reporting system.  Id. at pages 19-21.  Defendant argues that the CSE was not required to conduct an FBA because S.P.'s behavior did not impede her learning or that of other students and was adequately addressed by the PACE program.  Id.  Finally, Defendant argues that the PACE program provided S.P. with the small, structured program that S.P. needed to progress.  Id. at page 21.

Next, Defendant argues that Darrington was an inappropriate placement for S.P.  Id. at page 22.  Specifically, Defendant points to Darrington's larger class size and "self-paced" program to show that Darrington fails to provide the small, structured program required by S.P.  Id. at pages 22-23.  Defendant also noted that Darrington is not a "therapeutic program" because it does not have staff therapists, psychiatrists, or other counselors, and that S.P. was not seeing a social worker or receiving private therapy at Darrington.  Id. at page 24.  Finally, Defendant argues that Darrington is inappropriate because S.P. is not grouped with students with similar needs.  Id.

## II.    DISCUSSION

### A.    Standard of Review

"Courts have found that 'summary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions.' "  Antonaccio, 281 F. Supp. 2d at 714 (quoting A.S. ex rel. S. v. Norwalk Bd. of Educ., 183 F. Supp. 2d 534, 539 (D. Conn. 2002)).  However, unlike a typical motion for summary judgment, the inquiry in an IDEA action " 'is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been

16

compliance with the IDEA's processes and that the child's educational needs have been appropriately addressed.' " Id.  Indeed, the IDEA summary judgment procedure has been characterized as an appeal from an administrative determination.  Lillbask, 397 F.3d at 83 n.3.

Although a district court's review of an IDEA petition is an independent review and the standard to be applied is the "preponderance of the evidence," the Supreme Court has warned that the review to be conducted "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review." Rowley, 458 U.S. at 206.  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.' " Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206).  "Deference is particularly appropriate when, as here, the SRO's review has been thorough and careful."  Id.

### B.    **Burlington Factors**

As noted *supra*, in order to determine whether the Plaintiffs are entitled to summary judgment on the issue of reimbursement for the unilateral parental placement of S.P. at Darrington, the court must address the three Burlington factors.  Gagliardo, 418 F. Supp. 2d at 563.  A school district "may be required to pay for educational services obtained for a child by his or her parent if: (i) the services offered by the board of education were inadequate or inappropriate; (ii) the services selected by the parent were appropriate; and (iii) equitable considerations support the parents' claim."  Id. (citations omitted).


### 1)    ***Appropriateness of the 2005-06 IEP***

"Two issues are relevant to a federal court's review of a challenged IEP: (1) whether the state complied with the procedural requirements of the IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.' " Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206-07).

### a)    Procedural Review

"The initial procedural inquiry is no mere formality." Id.  Compliance with the procedures set forth in the IDEA is critical to ensure that the educational needs of a disabled child are met. Rowley, 458 U.S. at 206.  However, not every "procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003).  Only those procedural inadequacies "that individually or cumulatively result in the loss of educational opportunity, or that seriously infringe on a parent's participation in the creation or formulation of the IEP, constitute a denial of [a] FAPE." Gagliardo, 418 F. Supp. 2d at 563 (citing Knable v. Bexley City Sch. Dist., 238 F.3d 755, 766 (6th Cir. 2001)).

As stated *supra*, Plaintiff's first four arguments challenge the adequacy of the information on which the 2005-06 IEP was based.  Under the IDEA, the CSE must "consider the results of the initial evaluation or most recent evaluation of the child" when developing the child's IEP.  20 U.S.C. § 1414(d)(3).  Indeed, the CSE is required to "conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability." Id. § 1414 (a)(1)(A).  "In conducting the evaluation, the local educational agency shall . . . use a variety of assessment tools and strategies to gather relevant functional and developmental information, including information provided by the parent, that may assist in

18

determining . . . the content of the child's [IEP] . . . ."  Id. § 1414(b)(2)(A).  No single procedure

shall be used "as the sole criterion for . . . determining an appropriate educational program for the

child . . . ."  Id. § 1414(b)(2)(B); 34 C.F.R. § 300.532 (2005).

A reevaluation of the child must be conducted "if conditions warrant a reevaluation or if

the child's parent or teacher requests a reevaluation, but at least once every [three] years."  20

U.S.C. § 1414(a)(2)(A).  As part of any reevaluation, the local educational agency shall

> (1) review existing evaluation data on the child, including (i) evaluations and
> information provided by the parents of the child; (ii) current classroom-based
> assessments and observations; and (iii) observations by teachers and related
> services providers; and (2) . . . identify what additional data, if any, are needed to
> determine . . . the present levels of performance and educational needs of the child
> . . . [and] whether any additions or modifications to the special education and
> related services are needed to enable the child to meet the measurable annual
> goals set out in the IEP of the child . . . .

34 C.F.R. § 300.533(a).  Although New York law does not specify what a reevaluation must

include, regulations promulgated pursuant to New York Education Law require that a

reevaluation "be sufficient to determine the student's individual needs, educational progress and

achievement, the student's ability to participate in instructional programs in regular education and

the student's continuing eligibility for special education."  N.Y. Comp. Codes R. & Regs. tit 8, §

200.4(b)(4).

I conclude, and respectfully recommend that Your Honor should conclude, that the SRO

was correct in finding that the 2005-06 IEP at issue in this case complied with the requirements

stated above.  Defendant created S.P.'s initial IEP in 1998.  Subsequent to that time, S.P. was

reevaluated several times.  See Defendant's 56.1 Statement at ¶¶ 22, 30-60, 75-78, 142-46.  As a

result, S.P.'s 2003-04 IEP, which was created when S.P. was about to leave Devereaux and enroll

in Carmel High School, was based on a March 3, 2002, Social History, Psychological Evaluation,

and Educational Evaluation; a May 28, 1998, Physical Evaluation; a March 27, 2002,

Speech/Language Evaluation; an April 1, 2002, Report Card; a March 1, 2002, Teacher Progress

Report; an April 1, 2002, FBA; and an April 1, 2002, Behavior Intervention Plan.  AR,

Defendant's Exhibit 17.  The 2005-06 IEP at issue in this case was created as the result of the

CSE's annual review of the IEP.  The IEP indicates that the recommendation of the CSE was

based on a January 13, 2005, Social History Update; March 3, 2002, Psychological and

Educational Evaluations; a November 5, 2003, Physical Examination; a March 27, 2002,

Speech/Language Evaluation; a January 28, 2005, Report Card; an April 1, 2002, FBA; an April

1, 2002, Behavior Intervention Plan; a March 7, 2005, Speech/Language Progress Summary; a

March 8, 2005, Teacher Input Form; and an October 6, 2004, Psychological Statement.  AR,

Defendant's Exhibit 4.  In addition, the CSE reviewed a letter from S.P.'s private therapist at the

April 4, 2005, meeting.  AR, TR at pages 611-12.  Thus, the letter from the private therapist, the

Social History Report, the Physical Examination, the Report Card, the Speech/Language Progress

Summary, the Teacher Input Form, and the Psychological Statement were updated from or added

to the information that formed the basis of the IEP created for S.P. when she enrolled at Carmel

High School.

Although the record is unclear regarding the dates of S.P.'s triennial reevaluations (see

Defendant's 56.1 Statement at ¶¶ 22, 30-60, 75-78, 142-46), the existence of the updated and

additional documents relied upon in the 2005-06 IEP indicates that S.P. was reevaluated to some

extent before the 2005-06 IEP was created.  As required under the IDEA, the reevaluation

included the following: (1) evaluations and information provided by the parents in the form of a

letter from S.P.'s private therapist, an updated Social History Report, and input from S.P.'s mother

who was present at the April 4, 2005, annual review; (2) current classroom-based assessments and observations in the form of S.P.'s most recent report card, and a Speech/Language Progress Summary; and (3) observations by teachers and related service providers in the form of input from Ms. Curry, one of S.P.'s PACE program teachers, at the April 4, 2005, annual review; input from Dr. Brenner, the school social worker who saw S.P. at least once a week while she was at Carmel High School, at the April 4, 2005, annual review; and a Teacher Input Form written by Mr. Hoffman, S.P.'s other PACE program teacher.

The CSE also received input from a school psychologist, the Chairperson of the Special Education Department, a general education teacher, a family advocate, and a school guidance counselor at the April 4, 2005, annual review.  AR, Defendant's Exhibit 4.  The record demonstrates that many of the April 4, 2005, annual review attendees were familiar with S.P. or had interacted directly with S.P.  Specifically, Ms. Curry, one of the creators of the PACE Program, taught half of S.P.'s PACE Program classes and knew S.P. well.  AR, TR at page 540. Additionally, Dr. Brenner met with S.P. at least once a week, had a very open relationship with S.P., and communicated with S.P.'s teachers frequently.  AR, TR at pages 147-49, 540, 555-57, 562-63.  Thus, I conclude, and respectfully recommend that Your Honor should conclude, that S.P.'s reevaluation complied with the requirements of the IDEA and was sufficient to form the basis of the 2005-06 IEP.

Plaintiffs' argument that the 2005-06 IEP was procedurally inadequate because no psychiatric evaluation had been conducted since 1998 is without merit for two reasons.  First, as the SRO pointed out, the 2005-06 IEP was not based on this report.  AR, Defendant's Exhibit 5. Second, Plaintiffs have not pointed to, and I cannot find, any provisions of the IDEA or the

federal or state regulations that require that a psychiatric evaluation be included in a reevaluation. Thus, the 2005-06 IEP cannot be deemed procedurally inadequate due to the lack of a more current psychiatric evaluation.

Similarly, Plaintiffs' argument that the 2005-06 IEP was procedurally inadequate because no formal classroom observation was conducted while S.P. was in the 12:1:1 setting of the PACE program also lacks merit.  As explained above, the CSE had the benefit of having Ms. Curry present at the April 4, 2005, annual review.  In addition to being one of S.P.'s PACE program teachers, Ms. Curry conducted a December 11, 2003, Student Observation of S.P. while S.P. was at Green Chimneys.  AR, Defendant's Exhibit 12.  Therefore, Ms. Curry had a first-hand understanding of S.P.'s abilities in the one-on-one setting at Green Chimneys, as well as S.P.'s abilities after her transfer to Carmel High School.  Additionally, the CSE also had the benefit of reviewing the Teacher Input Form filled out by Mr. Hofmann, S.P.'s other PACE program teacher.  Thus, the 2005-06 IEP cannot be deemed procedurally inadequate due to the lack of a formal classroom observation while in the PACE program.

Likewise, Plaintiffs' arguments that the 2005-06 IEP was procedurally inadequate and fails to meet S.P.'s needs because it failed to rely on a current FBA or include a behavior plan is also without merit.  Under New York regulations, an FBA is required when a student's behavior impedes his or her learning or that of others.  N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1)(v).  The SRO found that the CSE was not required to conduct an FBA because S.P.'s behavior did not impede her learning or that of the other students.  I defer, and respectfully recommend that Your Honor should defer, to the judgment of the SRO.  As pointed out by the SRO, there is evidence that serious behavioral issues arose at home.  See, e.g., Plaintiffs' Exhibit

M; AR, TR at pages 113, 172, 206-07, 548-49.  However, according to the testimony of S.P.'s

teachers and school officials, the same cannot be said about her behavior at school.  While S.P.'s

teachers and other school officials testified that she had behaved impulsively at school and was

recommended for the anger management program, they also testified that S.P. "didn't have

outrageous out of control behaviors," AR, TR at page 651, "did not stand out . . . in the PACE

program to be . . . too much to handle," AR, TR, at page 438, was not "a student that we could not

help or rectify with her discipline issues," and was "a workable discipline problem," AR, TR at

page 410.

Furthermore, the 2005-06 IEP, through the PACE program, did in fact include a

behavioral modification plan.  Using the plan, S.P.'s teachers could motivate S.P. by taking away

her free period for tardiness, or by sending her to the Alternative Learning Center for bad

behavior.  According to testimony from S.P.'s teachers, this strategy worked for S.P., indicating

that the 2005-06 IEP was capable of meeting S.P.'s behavioral needs.  Thus, the 2005-06 IEP

cannot be deemed procedurally inadequate due to the lack of an FBA or behavioral modification

plan.

Plaintiff also claims that the 2005-06 IEP failed to include goals addressing S.P.'s

tendency to become distracted.  Under the IDEA, an IEP must include "a statement of measurable

annual goals, including benchmarks or short-term objectives, related to . . . meeting the child's . . .

educational needs that result from the child's disability . . ."  20 U.S.C. § 1414(d)(1)(A)(ii).

Although the 2005-06 IEP does not state a goal for S.P.'s tendency to become distracted, S.P.'s

problem is mentioned on page three of the 2005-06 IEP, where it states, "Distractibility and

impulsiveness impedes [sic] school progress."  Defendant's Exhibit 4.  The 2005-06 IEP addresses

this issue by stating that "ongoing service coordination is necessary as well as teacher direction to stay focused." Id. Thus, I conclude, and respectfully recommend that Your Honor should conclude, the failure of the 2005-06 IEP to address S.P.'s tendency to become distracted as a "goal" did not deprive S.P. of an educational opportunity, rendering the 2005-06 IEP procedurally inadequate.

Therefore, Plaintiffs' challenge of the adequacy of the information on which the 2005-06 IEP was based fails to support a finding that the challenged IEP was procedurally inadequate. Giving due weight to the SRO's findings, I conclude, and respectfully recommend that Your Honor should conclude, that the objective evidence in the record establishes that the District's reevaluation of S.P. complied with the requirements of the IDEA and federal and state regulations, and thus, the CSE had sufficient information on which to base the 2005-06 IEP.

Turning to Plaintiffs' fifth and final argument attacking the 2005-06 IEP's procedural adequacy, I conclude, and respectfully recommend that Your Honor should conclude, that it also fails to support the conclusion that the 2005-06 IEP was procedurally inadequate.      The IDEA requires, inter alia,

> an opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.

20 U.S.C. § 1415(b)(1). In addition, federal regulations governing parental participation require that, "[e]ach public agency shall take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate . . . ." 34 C.F.R. § 300.345(a). A parent's active participation in CSE meetings has been deemed sufficient

24

to fulfill the IDEA requirement that parents be given a meaningful opportunity to participate in the development of an IEP.  Cerra, 427 F.3d at 192-93.

Plaintiffs argue that Defendant failed to offer them a meaningful opportunity to participate because the CSE ignored their complaints about S.P.'s behavior at home and S.P.'s sexually inappropriate behavior at school.  Plaintiffs' Memorandum in Support at pages 14-16.  Although the SRO did not directly address whether or not Defendant deprived Plaintiffs of a meaningful opportunity to participate in the development of S.P.'s IEP by failing to listen to Plaintiffs' complaints about S.P.'s behavior at home, the SRO pointed out that S.P.'s mother was in frequent contact with S.P.'s special education teachers and with the school's social worker.  See SRO Decision at page 11.  Most significantly, the SRO noted that the school social worker "had developed a rapport with [S.P.], such that she was aware of conflicts between the student and her mother and . . . was, in fact, instrumental in assisting the family during a crisis at home by making arrangements for the student to be placed in a respite program at [the] Arbor House."  Id.  In addition, when S.P.'s mother requested an emergency CSE meeting because she could no longer handle S.P. at home, the CSE convened within two days of the request.  See Defendant's Exhibit 4; Plaintiffs' Exhibit M.  Indeed, S.P.'s mother was present at each CSE meeting involving S.P.'s IEP while she was enrolled, or planning to be enrolled, at Carmel High School (AR, Defendant's Exhibits 4, 7, 10, 11), and, as pointed out by the SRO, S.P.'s mother also questioned any document she received from the CSE if she did not understand it (SRO Decision at page 12).  In light of Plaintiffs' significant involvement with teachers and school officials at Carmel High School, and active participation in CSE meetings, in addition to Defendant's involvement with Plaintiffs regarding S.P.'s behavior at home, I conclude, and respectfully recommend that Your

Honor should conclude, that Defendant did not fail to offer Plaintiffs a meaningful opportunity to participate in the development of S.P.'s IEP by failing to respond to Plaintiffs' complaints regarding S.P.'s home behavior.

Likewise, Plaintiffs' allegation that Defendant failed to offer Plaintiffs a meaningful opportunity to participate in the development of S.P.'s IEP because it failed to address their concerns regarding S.P.'s sexually inappropriate behavior at school is also without merit. According to the testimony of Dr. Brenner, the CSE reviewed a letter from S.P.'s private therapist concerning the January, 2005, incident of sexually inappropriate behavior at the April 4, 2005, annual review. AR, TR at pages 611-12. Although Dr. Brenner could not remember the CSE discussing an alternative placement for S.P. in response to this letter, she did remember that the CSE discussed reducing the number of S.P.'s free periods in response to the concerns about S.P.'s sexually inappropriate behavior at school. Id. at page 611. In addition, the record shows that school officials were adequately involved in investigating the incident and responding to S.P.'s mother's concerns. Ms. Gentile, Carmel High School's Assistant Principal, testified that after the incident was reported, the school conducted an investigation, and concluded that the report was unfounded. AR, TR 401-06. Ms. Gentile also testified that she met with S.P. and her mother in March regarding the incident, and agreed to send a memo to all of the teachers and to the library stating that they should be aware of the relationship between S.P. and the other student. Id. at pages 401-02. This evidence indicates that Defendant made efforts to respond to Plaintiffs' concerns regarding S.P.'s sexually inappropriate behavior at school prior to and at the April 4, 2005, annual review. Thus, I conclude, and respectfully recommend that Your Honor should conclude, that Defendants did not deny Plaintiffs a meaningful opportunity to participate in

26

developing S.P.'s IEP when they declined to incorporate S.P.'s sexual behavior into the 2005-06 IEP.  Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has failed to show that the 2005-06 IEP was procedurally inadequate.

          b)        **Substantive Review**

        In addition to establishing that the contested IEP was procedurally inadequate, Plaintiffs are also required to show that it was substantively inadequate, or not "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207.  On the one hand, this requirement does not mandate that the school district " 'maximize the potential of [the disabled child].' " Walczak, 142 F.3d at 130 (quoting Rowley, 458 U.S. at 197 n.21).  Indeed, the IDEA "does not require a school district to provide 'everything that might be thought desirable by loving parents.' " Antonaccio, 281 F. Supp. 2d at 726 (quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 (2d Cir. 1989)).  "The purpose of the [IDEA] was 'more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.' " Walczak, 142 F.3d at 130 (quoting Rowley, 458 U.S. at 192).  On the other hand, a child does not receive a FAPE when his or her IEP provides opportunity for only trivial advancement.  Id.  "An appropriate public education under [the] IDEA is one that is 'likely to produce progress, not regression.' " Id.  (quoting Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 248 (5th Cir. 1997)).

        While the "reasonably calculated" test is a backward-looking test that requires a district court to determine whether "the IEP, at the time it was implemented, was designed to afford some educational benefit to the child," Gagliardo, 418 F. Supp. 2d at 563, courts have looked to "objective evidence," such as test scores, passing grades, and advancement from grade to grade as

27

indications of progress.  Walczak, 142 F.3d at 130.  Indeed, in Mrs. B. v. Milford Bd. of Educ.,

103 F.3d 1114 (2d Cir. 1997), the Second Circuit affirmed the district court's reliance on a

student's failure to achieve most of her IEP goals, low grades, and advancement of only one grade

in three years, to find an IEP substantively inadequate.  Id. at 1121.  In assessing progress,

deference to the SRO's decision is particularly important because state administrative agencies

have special expertise in determining a student's progress.  Cerra, 427 F.3d at 195.

    Here, the SRO concluded that the 2005-06 IEP was substantively adequate.  I conclude,

and respectfully recommend that Your Honor should conclude, that the SRO's finding was

correct.  First, under an almost identical 2004-05 IEP, which also recommended the PACE

program, S.P. progressed from ninth grade to tenth grade.  Second, S.P.'s grades showed some

improvement from the first quarter of her tenth grade year to the fourth quarter.  Although S.P.

left Carmel High School in the middle of the fourth quarter, S.P. received grades for six out of ten

classes in the fourth quarter, based on her performance during the first half of the quarter.  AR,

TR at pages 149-50.  Her grade improved from her first quarter grade in five out of those six

classes, and she received passing average grades for all of the six classes.  AR, Defendant's

Exhibit 3.  In addition, according to an April 22, 2005, Progress Report, S.P. also made progress

on her IEP goals during the three and one-half quarters she spent in tenth grade at Carmel High

School.  See Defendant's Exhibit 2.  S.P. received marks in the fourth quarter for all of her IEP

goals except for her Speech/Language goals and her Social/Emotional/Behavioral goals.  Id.  For

the goals given marks in the fourth quarter, S.P. improved from "some progress" in the third

quarter to "progressing satisfactorily" in the fourth quarter, or from "progressing satisfactorily" in

the third quarter to "completed" in the fourth quarter.  Id.  I conclude, and respectfully

recommend that Your Honor should conclude, that S.P.'s grade promotion, grade improvements, and IEP goal accomplishments constitute sufficient objective evidence of steady progress while S.P. was in the PACE program to support the conclusion that the 2005-06 IEP was substantively adequate.

In addition to this objective evidence, several teachers and school officials testified that S.P. was making progress in the PACE program.  For example, Ms. Rohe, Carmel High School's Director of Pupil Services, testified that "[S.P.] wanted to come to school every day. She was . . . passing all of her courses.  She was making progress overall in relation to her goals and objectives.  She was getting the services that the CSE had agreed that she needed.  She was part of her community.  She was well liked and really building solid relationships with other kids." AR, TR at page 88.  Mr. Hofmann, one of S.P.'s PACE program teachers testified that S.P.'s "behaviors in the classroom were getting better and better" and that "grade wise . . . she did a lot better in the fourth quarter than she did in the third."  AR, TR at page 149.  Additionally, Mr. Twardy, S.P.'s Physical Education Teacher, testified that he thought S.P. was "progressing in the right direction."  AR, TR at page 494.

Plaintiffs argue that the number of times S.P. was removed from class due to discipline problems establishes that the 2005-06 IEP was not adequate to ensure that S.P. would benefit from her education.  The IHO agreed with Plaintiffs.  IHO Decision at 13.  However, the SRO pointed out that although S.P. was removed from the PACE program, she continued her school work in the Alternative Learning Center.  SRO Decision at 12.  The SRO also pointed out that while S.P.'s discipline problems often corresponded with S.P.'s complaints about disputes with her mother at home, the PACE program included a behavior management component "with a

progression of strategies that could be implemented as the student's behavior deteriorated." Id. at

13. Thus, the SRO concluded that the PACE program recommended by the 2005-06 IEP

"provided a small, structured program which allowed for close monitoring of the student's

progress . . . and included sufficient structure and strategies to address her increasing emotional

needs in the classroom as they were affected by her home situation." Id. at 14.

Giving due weight to the SRO's decision, especially in light of the objective evidence of

S.P.'s promotion to tenth grade, grade improvement, IEP goal accomplishment, and the testimony

of S.P.'s teachers and other school officials, I conclude, and respectfully recommend that Your

Honor should conclude, that the 2005-06 IEP was substantively adequate to provide S.P. with a

FAPE under the IDEA.  Because Plaintiffs have not carried their burden of showing the

inappropriateness of Defendant's IEP, I conclude, and respectfully recommend that Your Honor

should conclude, that the appropriateness of Plaintiffs' unilateral placement of S.P. at Darrington

and any equitable considerations weighing in Plaintiffs' favor need not be addressed.  See, e.g.,

Cerra, 427 F.3d at 192.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, I conclude and respectfully recommend that Your Honor

should conclude, that Defendant appropriately addressed S.P.'s needs and formulated an IEP that

was reasonably calculated to confer educational benefit on S.P.  Accordingly, I conclude, and

respectfully recommend that Your Honor should conclude, that Defendant's cross-motion for

summary judgment should be granted and Plaintiffs' motion for summary judgment should be

denied.

## VI.   **NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall

have ten (10) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(e), or a total of

thirteen (13) working days from the date hereof, to file written objections to this Report and

Recommendation.  See Fed. R. Civ. P. 6(a).  Such objections, if any, shall be filed with the Clerk

of the Court, with extra copies delivered to the chambers of The Honorable Colleen McMahon,

United States Courthouse, Southern District of New York, 300 Quarropas Street, White Plains,

New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later

appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge McMahon.

Dated: January 4, 2007
White Plains, New York

Respectfully Submitted,

LISA MARGARET SMITH
United States Magistrate Judge

Copies of the foregoing Report and Recommendation have been sent to the following:
Colleen McMahon, U.S.D.J.